Moss Industries, Inc., Alleged Transferee of U.S. Electric Home Products Inc. v. Commissioner.
Moss Indus. v. Commissioner
Docket No. 32920.
United States Tax Court
1953 Tax Ct. Memo LEXIS 325; 12 T.C.M. (CCH) 317; T.C.M. (RIA) 53094; March 26, 1953
*325 Where Industries, an alleged transferee, was shown to have received $138,083.79 from Electric above and beyond any charges due from Electric to Industries and the transfer was shown to have caused the insolvency of Electric and to have been made without consideration, held, on the record as a whole, the respondent has sustained his burden of proving Industries to be the transferee of Electric within the meaning of section 311 of the Internal Revenue Code. Sidney Szerlip, Esq., for the petitioner. Joseph F. Rogers, Esq., for the respondent. HILL Memorandum Findings of Fact and Opinion This proceeding involves deficiencies in income taxes of $2,284.17 and $24,782.43 assessed against the petitioner as transferee of U.S. Electric Home Products, Inc., for the calendar years 1945 and 1946, respectively, together with penalties of $685.25 and $7,434.73. The questions involved are: 1. Did U.S. Electric Home Products, Inc., sustain a net operating loss in the year 1947, which, carried back to 1945 and 1946, [would] eliminate its deficiencies in income tax for the latter two years? 2. If such corporation did not sustain such net operating loss, is petitioner subject to transferee liability *326 under section 311 of the Internal Revenue Code and, if so, is the petitioner subject to negligence penalties under section 293 (a) and to delinquency penalties under section 291 of the Code? Findings of Fact The business entities involved in this proceeding are U.S. Electric Home Products, Inc. (hereinafter referred to as Electric) and its alleged transferee, Moss Industries, Inc. (hereinafter referred to as Industries). Industries began business on January 1, 1946, as successor to Henry Moss & Co., a partnership dissolved at the close of 1945. Henry Moss & Co., the partnership, was successor to Henry Moss & Co. Inc., which ceased doing business in 1942. Electric was incorporated February 14, 1945. George S. Moss was president of Industries, and his uncle, Lothair Szerlip, was president of Electric, and both were partners in Henry Moss & Co. Both George S. Moss and Lothair Szerlip are graduates of law schools and members of the bar of New York State. Henry Moss & Co. dealt in the manufacture of electric irons, which represented 35 to 40 per cent of its business, the balance of which was the manufacture of a wide range of mechanical and industrial items of all types. Industries' chief *327 product was electric irons, which represented 50 to 60 per cent of its business. Electric's only business was the sale and distribution of electric irons manufactured by Henry Moss & Co. and Industries and it had the exclusive agency for such sales. Electric filed no corporate income tax returns for 1945 and 1946 and paid no taxes for those years. No sufficient reason was shown for failure to file such returns. The following deficiencies in income tax and penalties were determined against Electric on March 25, 1949: Penalty
Year
Tax
Negligence
Delinquency
1945
$ 2,284.17
$ 114.21
$ 571.04
1946
24,782.43
1,239.12
6,195.61
The delinquency and negligence penalties were determined against Electric for the reason that no original returns were filed for 1945 and 1946. However, on December 8, 1950, after Government seizure of Industries under a jeopardy assessment as the alleged transferee of Electric, Electric filed a corporation income tax return for the year 1947 claiming an alleged net operating loss of $165,245.24, and on the same date filed claims for a net operating loss carryback intended to eliminate its taxable income for 1945 and 1946. Electric agreed to the deficiencies and penalties determined *328 against it through its president, Lothair Szerlip, who signed a Form 870 in the presence of Harry Porges, the investigating revenue agent. Lothair Szerlip signed the above mentioned Form 870 after the significance of such signing had been explained to him by Jacob Kromberg, accountant for Electric and Industries. The deficiencies and penalties asserted and agreed to on Form 870 were determined as the result of examinations of Electric, Industries, and a number of related entities made by Porges with the cooperation of Kromberg. These examinations lasted over two years, running from November 1946 to December 1948 and covered Electric for the years 1945 and 1946, Industries for the year 1946; and Henry Moss & Co. for the year 1945. B. Franklin Moss, father of George S. Moss, was president of Henry Moss & Co. Inc., the original corporation, and an equal partner in Henry Moss & Co., the partnership, as well as the original president of Industries. The stock of Henry Moss & Co. Inc. was controlled by B. Franklin Moss, Lothair Szerlip and his brother, Arthur Szerlip. Arthur and Lothair Szerlip were brothers of Grace Moss, who was the wife of B. Franklin Moss and mother of George S. Moss. *329 The partners in Henry Moss & Co. were B. Franklin Moss, George S. Moss, Lothair Szerlip and Arthur Szerlip. The profits were divided equally. When Henry Moss & Co. was dissolved on December 31, 1945, the partners simply transferred all the assets and liabilities to Industries. The stock of Industries was shared according to their proportionate interest in the partnership. The directors of Industries were George S. Moss (hereinafter referred to as Moss), his mother, Grace Moss, who became a director after the death of B. Franklin Moss, and Arthur Szerlip. Lothair Szerlip became a director during the latter part of 1947 or early 1948. The officers of Electric were Lothair Szerlip, president, Moss, secretary, and Raphael Blank, treasurer. Electric had no paid employees. Aside from the services of Lothair Szerlip, the only people who worked for Electric was a man named Abrams and his helper, who operated as independent contractors. Industries conducted its operations from four addresses in Brooklyn, New York. The addresses of the buildings were as follows: 101-123 53rd Street, 162 57th Street, 146-152 57th Street, and 151 or 153 to 171 or 173 58th Street. The last mentioned addresses were *330 a complete building and one could pass through it from 57th Street to 58th Street. This building also housed the Electric shipping office located at 145 or 151 58th Street. The only space occupied by Electric was an executive office at 5114 4th Avenue and the shipping office located at 145 or 151 58th Street. The Electric office at 5114 4th Avenue was 30 X 60 feet in dimension and was used to keep samples, displays and neon arrangements. Lothair Szerlip did most of his work at this office. Electric's shipping office was approximately 10 X 6 or 7 feet. Electric paid no rent to Industries for the use of the shipping office. Kromberg, who had been a certified public accountant for over 30 years, was the accountant for both Electric and Industries and had been retained by petitioner for a period of over two years, from the latter part of 1946 to the end of 1948, for the purpose of auditing the books and records of Henry Moss & Co., Electric and Industries in connection with Porges' examination. Both Porges and Kromberg requested Moss and Lothair Szerlip to make available all the books and records of Industries, Electric and related entities. During the course of this examination Moss was *331 present many times and Szerlip, although not present as much as Moss, took an interest in the examination and discussed it with both Kromberg and Porges on a number of occasions. Kromberg and Porges examined the books of all the corporations including Electric, Industries, O'Brien Press, American Specialty and other interrelated companies. Neither Porges nor Kromberg retained their work sheets pertaining to the examination made from 1946 through 1948. The agent did not retain his work sheets because the petitioner and Electric had agreed to the agent's adjustments and had signed a waiver of restrictions on assessment and collection of deficiency in tax; Kromberg had not retained his work sheets because all of them were surrendered prior to the hearing to the petitioner at its request. In examining the books and records of Electric for 1945 and 1946, Industries for 1946 and Henry Moss & Co., for 1945, Porges and Kromberg also examined the following related entities: O'Brien Press, Inc., American Specialty Manufacturing Co., American Specialties Manufacturing Corp., Clogg Company, Inc., Seacliff Manufacturing Co., Knickerbocker Realty Co., Realtex Co., Ridgeway Realty Corp., Man of Manhattan, *332 Nancy Dale, Ltd., and Pan American Metal Products, Inc. There were transactions between Henry Moss & Co., Industries and Electric with all of these entities. These related companies either had no books or what records they had were incomplete, as were the records of Industries and Electric. All of these companies were interrelated because of a close identification of ownership and many of the companies had extensive transactions with each other to the point that it was impossible to determine the net income of one without examining the others. As the result of the 1946-1948 examination, Kromberg and Porges working together prepared the following balance sheet for Electric for the year ended December 31, 1946: Assets
Per Books
Debit
Credit
Amended
Cash
$ 11,414.04
$ 11,414.04
Accounts Receivable
25,366.27
25,366.27
Due from Moss Industries,
Inc.
138,083.79
138,083.79
Total Assets
$174,864.10
$174,864.10
Liabilities
Accounts Payable
$ 81,660.94
$ 81,660.94
Accrued Expenses
3,960.00
3,960.00
Accrued Excise Taxes
15,195.98
15,195.98
Accrued Income Taxes
27,066.60
$8,119.98 * *333 35,186.58
Capital Stock
2,500.00
2,500.00
Earned Surplus
44,480.58
$8,119.98 *
36,360.60
Total Liabilities and
Capital
$174,864.10
$8,119.98
$8,119.98
$174,864.10
This balance sheet reflects all of the assets and liabilities determinable from all of the books and records or other sources of information made available to Kromberg and Porges. The item of assets, indicated above as "Due from Moss Industries, Inc., $138,083.79," represented remittances of funds from U.S. Electric to Moss Industries in excess of any charges due from Electric to Industries. We find that the balance sheet set out above accurately reflects all of the assets and liabilities of Electric on December 31, 1946. From the period December 31, 1945, to July 23, 1946, Industries received $427,250 in cash from Electric. This fact was reflected by the cash disbursements journal of Electric at the time of the examinations of the books and records as above indicated. Electric agreed that it was merely a selling agent and distributor for Henry Moss & Co. and of Industries, and at that time Industries signed a Federal Form 728 agreeing to an additional Federal excise tax assessment based on the above figure for such period. No corporate income tax returns were filed by Electric for the taxable years 1945 and 1946. Lothair Szerlip knew that no income tax *334 returns had been filed for those years. Moss was aware that the transfers of money made by Electric to Industries had rendered Electric insolvent and unable to pay the deficiencies in income tax determined against it. Electric first made a net operating loss claim for the taxable year 1947 in a belated return filed by it on December 8, 1950, on the basis of which it sought to carry back such loss as deductions to its taxable years 1945 and 1946. The net operating loss claimed by Electric was based upon alleged additional costs in the amount of $364,362.78 incurred for unfinished irons, tools, dies, designs and engineering work allegedly undertaken by Industries on behalf of Electric. These alleged additional expenditures were based on a purported agreement between Electric and Industries made by Moss and Lothair Szerlip, which provided in part as follows: "This Agreement made this 5th day of March, 1945, between HENRY MOSS & CO., hereinafter designated as the Manufacturer, and U.S. ELECTRIC HOME PRODUCTS INC., hereinafter designated as the Purchaser, both of Brooklyn, New York. "The Manufacturer agrees to manufacture electric irons for the Purchaser who agrees to buy same from the *335 Manufacturer for a period of Three (3) years from date hereof. "The Purchaser hereby agrees to pay the Manufacturer the sum of One ($1.00) dollar for each iron manufactured and delivered to the Purchaser. "The Manufacturer agrees to manufacture these irons exclusively for this Purchaser during this three-year period. "It is further understood and agreed between the Manufacturer and the Purchaser that the Manufacturer will expend considerable sums of money in tooling, setting up and otherwise preparing for the manufacture of these irons, and it is further understood that the estimated cost of such preparation will entail approximately the sum of Forty Thousand ($40,000.00) dollars. "It is, therefore, understood and agreed that in order to reimburse the Manufacturer for the above estimated preparation costs, the Purchaser shall turn over to the Manufacturer such sums as the Manufacturer may demand from time to time. "The tools and dies, which are part of the preparation costs, shall not become the property of the purchaser, irrespective of any sums advanced to the manufacturer by the purchaser until such time as the purchaser buys and pays for one million irons, at which time title to *336 the tools and dies only shall pass to the purchaser. "The Manufacturer shall on November 30th, 1945, invoice the Purchaser for the number of irons delivered by the Manufacturer to the Purchaser at the price above set forth, and the Purchaser shall have ten (10) days from date thereof to pay said invoice so rendered by the Manufacturer to the Purchaser. * * *
"It is also further agreed that not later than November 30th, 1945, the Manufacturer will submit to the Purchaser a detailed statement indicating all the charges incurred by the Manufacturer involving preparation costs for the manufacture of the irons. "It is further mutually agreed by and between the Manufacturer and the Purchaser that the Manufacturer will not assess any further preparation charges after November 30th, 1945 unless mutually agreed to in writing between the Manufacturer and the Purchaser. "IN WITNESS WHEREOF, the parties hereto have set their hands and seals the day and year first above written." An executed copy of the purported agreement was not produced at the hearing of this cause. Instead an unexecuted copy, purporting to set forth the terms of a tentative agreement, was introduced in evidence and it is that *337 which is set forth above. We find that all of the costs for tools, dies, designs, experimental, engineering and other manufacturing costs incurred in connection with the manufacture of electric irons or any other product by Henry Moss & Co. and Industries for Electric are reflected in the balance sheet of Electric set out above. Electric is not entitled to a net operating loss deduction for the year 1947. A jurisdictional strike occurred in the plant of Industries in the latter part of 1946 and continued for about a year. It was so violent in nature as to completely disrupt normal business procedures. The Commissioner seized the plants and equipment of Industries on November 9, 1950, as transferee of the assets of Electric under a jeopardy assessment. After the sale of the assets of Industries as alleged transferee of Electric, the keys to the buildings were returned to Moss and Lothair Szerlip. We find Industries to be the transferee of Electric in the amount of $138,083.79, and that the transfer, which left Electric insolvent, was without consideration and represented a transfer of cash above and beyond any and all charges due from Electric to Industries for services, goods or merchandise *338 received or contracted for. Opinion HILL, Judge: The first question to be resolved is whether the deficiencies in income tax determined against Electric for the years 1945 and 1946 are supported by the facts. The evidence discloses that the books and records of Industries, Electric, and a number of related entities were so inadequate, through failure to record transactions and keep records up to date, as to result in confusion concerning the true status of the accounts. No returns were filed by Electric for the years 1945 and 1946. Since this was so and since Electric's bookkeeping records were totally inadequate, adjustments were made by the method of reconstructing net income on the basis of gross receipts. The burden of proof is on the petitioner to prove that the respondent erred in his determination of the deficiencies. The petitioner failed to show what Electric's income for 1945 or 1946 actually was or to introduce any evidence tending to show that the Commissioner's computation was incorrect. The respondent produced the petitioner's own accountant, who had worked closely with the internal revenue agent responsible for the reconstruction, who testified that he agreed with the *339 adjustments made. The accountant, Kromberg, also testified that he had advised Lothair Szerlip of the full significance of signing the Form 870, introduced in evidence by the respondent, and that he explained fully each item of the balance sheet set forth in our findings of fact and that after his explanation Lothair Szerlip had signed the form. No evidence having been introduced at the trial by the petitioner on this question, the respondent's evidence, which is convincing, must prevail and we hold that the deficiencies determined against Electric for the years 1945 and 1946 are correct. Electric failed unreasonably to file returns for the years 1945 and 1946. Therefore, the negligence penalty in accordance with section 293 (a) of the Internal Revenue Code[1] *340 is proper. This being the case and since the petitioner failed to show that such failure was due to reasonable cause and not due to willful neglect, it is also subject to a delinquency penalty under section 291 of the Code. [2] *341 The burden of proof rested upon the petitioner to show that the Commissioner erred in determining both the negligence and the delinquency penalties. The petitioner failed to establish the error of the Commissioner's determination on this point. Lothair Szerlip, president of Electric, testified that returns were prepared by Electric for the years 1945 and 1946 and that he had given these returns to Electric's accountant, Kromberg, for filing. Kromberg contradicted Szerlip's testimony upon this point, saying instead that it was not his custom to file returns for taxpayers, that he did not file any returns for Electric, but rather that he had prepared and returned them to Lothair Szerlip. Testimony adduced by petitioner's witnesses also described at length the jurisdictional strike which occurred in the Industries' plants beginning in the fall of 1946 and continuing for about a year. But this testimony has no weight tending to explain Electric's failure to file returns, for if it is true, as Lothair Szerlip testified that Electric was a completely independent organization, maintaining *342 its own offices, books, records and personnel, the jurisdictional strike occurring in Industries' plants, beginning late in 1946, is no justification for Electric's failure to keep adequate books and records and duly to file its returns. The evidence produced by the petitioner fails to prove that Electric kept adequate books and records or that it filed its returns for 1945 and 1946 or had any reasonable cause for failure to do so. For these reasons the negligence penalties assessed under section 293 (a), together with the delinquency penalties assessed under section 291 of the Code are upheld as proper. We now turn our attention to the alleged net operating loss claimed by Electric for the year 1947. Regulations 111, section 29.122-1, provides in part as follows: "Every taxpayer claiming a net operating loss deduction for any taxable year shall file with his return for such year a concise statement setting forth the amount of the net operating loss deduction claimed and all material and pertinent facts relative thereto, including a detailed schedule showing the computation of the net operating loss deduction." An examination of the claims filed by Electric reveals that it failed *343 to file the statement or the detailed schedule showing the computation of the loss as required by the above regulations. Indeed, it might be said that the petitioner has failed altogether to submit any substantiating evidence which would tend to establish the net operating loss deduction which it urges upon this Court as sufficient to offset the deficiencies determined against Electric for the years 1945 and 1946. The petitioner bases its chief reliance upon the purported agreement set forth in our findings of fact. The exhibit introduced in evidence was apparently a tentative draft, a carbon copy at that, and unsigned. According to the testimony of Moss, he, on behalf of Industries, and Lothair Szerlip, on behalf of Electric, entered upon this agreement. Electric by the terms of the agreement allegedly assumed additional costs incurred by Industries for tooling, engineering, etc. When Moss was asked whether or not Kromberg saw this agreement or the alleged agreement as finally drawn, he stated that he believed that he had shown Kromberg both of them. Kromberg, however, contradicated Moss, saying that he had no recollection of ever having seen this agreement. He said further that he *344 had no recollection of it having been referred to him and he did not recognize it at all. The alleged agreement on its face states that it was made on the 5th day of March, 1945. The first examination of the records of Electric and Industries by Kromberg and Porges occurred during the period running from 1946 through 1948, yet this document, so important in determining the income and expenses of both Industries and Electric, existed, if at all, apparently without the knowledge of the petitioner's accountant who had been charged by the petitioner with accuracy in determining the income of the two, Industries and Electric. All of the alleged additional costs, in the amount of $364,362.78, are based upon the existence of this alleged agreement. Certainly, therefore, it is fair to assume that if such an agreement existed it would have been called to the attention of both Kromberg and Porges. In 1950 Rosenbaum, an accountant, was hired by Electric and Industries to prepare Electric's net operating loss claims for the year 1947. He also denied ever seeing such an agreement and testified that it was impossible for him to determine by the books and records submitted to him whether or not in *345 fact Electric had incurred a net operating loss and further testified that only with verbal information supplied by Moss and Lothair Szerlip was it possible for him to determine the existence of such a loss. The only information furnished by Electric to Rosenbaum was the receipt or sales book of Electric. Thus the claims prepared by Rosenbaum to support the net operating loss were based chiefly on verbal information supplied by Moss, Szerlip and the bookkeeper for Industries. Nor did Szerlip at any time furnish to Rosenbaum any books, records or documents to support the net operating loss. In view of the denial of Kromberg, the accountant charged by the petitioner with the protection of its interests, of any knowledge either of the agreement of Electric to assume the additional costs or of the alleged additional costs themselves, this Court has no choice but to hold that the petitioner has failed to meet its burden of proof in establishing the existence of a net operating loss for Electric during the year 1947. Under the provisions of section 1119 (a) of the Code [3] the burden of proof is upon the respondent to show that the petitioner is liable as a transferee of U.S. Electric. The *346 respondent's burden can be met only by evidence which establishes that Electric transferred, without consideration, its assets to Industries and that such transfer left Electric insolvent and unable to meet its obligations, including the $38,322.26 in income tax and penalties which had accrued for the years 1945 and 1946. [4] *347 An examination of the balance sheet, made a part of our findings of fact, makes it plain that Electric transferred $138,083.79 to Industries. That the transfer was without consideration is evidenced by the testimony of Kromberg, who, when asked whether the $138,083.79 transferred represented an out and out transfer of profits or whether it was for goods sold, replied: "As of December 31, 1945, that is the amount of money which had been paid from U.S. Electric to Moss in excess of any charges from Moss to U.S. Electric that we were able to determine up to that time." In arriving at the figure of $138,083.79 transferred by Electric to Industries without consideration, Kromberg and Porges, after taking into account all the cost figures, including labor, material and manufacturing cost of all the electric irons delivered to Electric, *348 computed a unit charge per iron in the amount of $1.20 or $1.30 per iron. In addition Moss had worked with Kromberg and Porges in reaching the unit cost figure for the irons. This total unit cost figure was charged to Electric for each iron shipped. The cost was then applied against the receipts that Electric received from its billings to outsiders, leaving a balance of $138,083.79. After taking into account all of the costs and expenses incurred in the manufacture and the profit determined for Industries, the $138,083.79 transferred by Electric to Industries represented a balance of cash belonging to Electric above and beyond any and all charges due and owing from Electric to Industries. Prior to the signing by Lothair Szerlip of Form 870 setting forth the deficiencies and penalties asserted against Electric for 1945 and 1946, the balance sheet shown above was explained fully to Szerlip by Kromberg. Kromberg also discussed the adjustments made with Moss several times and advised Lothair Szerlip and Moss of the meaning of the Form 870 and the significance of signing such a form and advised the acceptance of the agent's findings, explaining fully to them the balance sheet showing the *349 transferee item of $138,083.79. Remembering that the balance sheet in question was prepared only after an examination of the books of Electric and Industries, which lasted for over two years and which took into account all of the books and records made available to Kromberg and to Porges, together with information supplied orally by Moss and Lothair Szerlip, we are convinced that Industries is the transferee of $138,083.79 of Electric's money and that the transfer was without consideration. That the transfer left Electric insolvent and unable to pay its accrued tax liabilities is evidenced by the following testimony of Kromberg: "A. The assets as shown on December 31, 1946, in total, were $174,864.10. That total includes as an amount receivable from Moss $138,083.79. Now, the total liabilities as of the same date, according to the balance sheet, were $127,883.52. There was, therefore, an equity in the business of $46,980.58. However, that equity would exist only if the $138,083.79 was a collectible account. If it was not, then the company would have been insolvent by the amount of $91,103.21." By Mr. Rogers: "Q. Now, in your study of those books, did you find any proof that that represented *350 a collectible account? "A. I am afraid I would have to say it did not appear to be collectible." Lothair Szerlip, the president of Electric, admitted that during 1948, 1949 and 1950 Electric did no business and filed no tax returns, nor had it filed any for the year 1947 until the belated return was filed in 1950 claiming the net operating loss deduction discussed above, and to all intents and purposes Electric was "as dead as anything possibly could be." Moss also admitted that he had learned of the inability of Electric to meet its current obligations in "1946, 1947, early 1947 or thereabouts." We have examined the voluminous record, containing 2,037 pages, with care, as well as the exhibits submitted by the parties. The evidence considered as a whole supports the contention of the respondent. It will serve no useful purpose to attempt to discuss each separate item of the extensive testimony rendered by Moss and Szerlip or by the respondent's witnesses. Likewise, it would be futile to undertake to reconcile the numerous inconsistencies and contradictions placed in evidence by the parties. It is enough to observe that on the record as a whole the respondent has met his burden of proof *351 and that Industries is the transferee of Electric. We therefore hold that the petitioner is the transferee of $138,083.79 of Electric's assets, that the transfer was without consideration and left Electric insolvent and unable to pay its outstanding tax liabilities. Decision will be entered for the respondent. Footnotes
*. To accrue liability for penalties.
1. SEC. 293. ADDITIONS TO THE TAX IN CASE OF DEFICIENCY. (a) Negligence. - If any part of any deficiency is due to negligence, or intentional disregard of rules and regulations but without intent to defraud, 5 per centum of the total amount of the deficiency (in addition to such deficiency) shall be assessed, collected, and paid in the same manner as if it were a deficiency, except that the provisions of section 272 (i), relating to the prorating of a deficiency, and of section 292, relating to interest on deficiencies, shall not be applicable. 2. SEC. 291. FAILURE TO FILE RETURN. (a) In case of any failure to make and file a return required by this chapter, within the time prescribed by law or prescribed by the Commissioner in pursuance of law, unless it is shown that such failure is due to reasonable cause and not due to willful neglect, there shall be added to the tax: 5 per centum if the failure is for not more than thirty days with an additional 5 per centum for each additional thirty days or fraction thereof during which such failure continues, not exceeding 25 per centum in the aggregate. The amount so added to any tax shall be collected at the same time and in the same manner and as a part of the tax unless the tax has been paid before the discovery of the neglect, in which case the amount so added shall be collected in the same manner as the tax. The amount added to the tax under this section shall be in lieu of the 25 per centum addition to the tax provided in section 3612 (d) (1).
3. SEC. 1119. PROVISIONS OF SPECIAL APPLICATION TO TRANSFEREES. (a) Burden of Proof. - In proceedings before the Board the burden of proof shall be upon the Commissioner to show that a petitioner is liable as a transferee of property of a taxpayer, but not to show that the taxpayer was liable for the tax. ↩
4. SEC. 311. TRANSFERRED ASSETS. (a) Method of Collection. - The amounts of the following liabilities shall, except as hereinafter in this section provided, be assessed, collected, and paid in the same manner and subject to the same provisions and limitations as in the case of a deficiency in a tax imposed by this chapter (including the provisions in case of delinquency in payment after notice and demand, the provisions authorizing distraint and proceedings in court for collection, and the provisions prohibiting claims and suits for refunds): (1) Transferees. - The liability, at law or in equity, of a transferee of property of a taxpayer, in respect of the tax (including interest, additional amounts, and additions to the tax provided by law) imposed upon the taxpayer by this chapter. * * *
(f) Definition of "Transferee." - As used in this section, the term "transferee" includes heir, legatee, devisee, and distributee.↩